## In re HERSHKOWITZ.

### (District Court, S. D. New York. May 4, 1903.)

### No. 3,821.

1. BANKRUPTCY—REVIEW OF REFEREE'S DECISION—CONSTRUCTION OF ORDER.

Where a court of bankruptcy, on a petition for review of an order of a referee requiring a bankrupt to turn over certain property to his trustee, or to pay its value, made an order giving the bankrupt a stated time within which to comply with the order of the referee, it was impliedly an affirmance of such order, and it is not again subject to review in subsequent proceedings.

[Ed. Note.—Appeal and review in bankruptcy cases, see note to In re Eggert, 43 C. C. A. 9.]

2. SAME—CONTEMPT—FAILURE TO OBEY ORDER TO SURRENDER PROPERTY.

The fact that a court of bankruptcy in affirming an order of a referee requiring a bankrupt to turn over property to his trustee struck therefrom a provision for the commitment of the bankrupt in case of his default, and gave him additional time, is not an adjudication that he should not be so punished, but leaves that matter to be brought up anew by motion in case the bankrupt fails to obey the order within the time allowed.

In Bankruptcy. On motion for order committing the bankrupt for contempt.

The following is the opinion of the referee (William H. Willis):

This is a proceeding on a petition of William Ford Upson, the trustee in bankruptcy of the above-named bankrupt, and an order made thereon requiring the said bankrupt to show cause before me why he should not deliver over to said trustee "all the property heretofore and still concealed by him from said trustee, to wit, property of the value of $6,500, consisting of furs and skins; or why he should not turn over and deliver to said trustee $6,500 in money, being the equivalent in value of said property concealed by said bankrupt." On hearings had before me on the return of such order to show cause I have been attended by Mr. Rosenberg of Messrs. James, Schell & Elkus, attorneys for the trustee, and by Mr. Jesse Epstein, attorney for the bankrupt, and the proofs offered on such hearings are as follows: "All the evidence taken at the first meeting and on specifications and at other times, and the report of the Honorable Ernest Hall, referee in bankruptcy, and order

of the Honorable George B. Adams, Judge of the United States District Court, confirming said report, and refusing a discharge in bankruptcy on the ground that the bankrupt concealed $6,500 worth of goods; and on all other proceedings herein." It appears that on the application of the bankrupt for his discharge objection was made on behalf of certain creditors on certain specified grounds and that the issues raised by such specifications were duly referred to the Honorable Ernest Hall, referee in bankruptcy, as special commissioner, to ascertain and report the facts. It further appears that after hearings before the said special commissioner and the examination of numerous witnesses, including the bankrupt himself, and the introduction of other testimony and proofs, including the testimony of the bankrupt and other witnesses taken at the first meeting, the said special commissioner rendered his report, bearing date May 7, 1902, finding that all the specifications were fully sustained, and that the discharge of the bankrupt should be denied. On the 24th day of May, 1902, this report was duly confirmed by the court, and the discharge of the bankrupt refused accordingly.

The report in question, which was based on the same evidence that is now before me, contained an analysis of the facts as presented, and an able opinion thereon; and after a very careful examination of the same, and also of the evidence on which it is founded, I accept such report as truly and correctly expressing my own views in the premises, and embody the same herein. This report is as follows:

"To the District Court of the United States for the Southern District of New York:

"I, Ernest Hall, the referee in charge of the above-entitled matter, to whom was referred, as special commissioner, the specifications of objection to the discharge of the above-named bankrupt, having been attended by the bankrupt in person and his counsel and by the counsel for opposing creditors, and having heard the proofs of the opposing creditors in support of said specifications and the proofs offered by the bankrupt in opposition, and having heard and considered the arguments of counsel for the respective parties, and after due deliberation, do report as follows:

"The specifications, although stated in several different forms, present but two vital questions for consideration, viz.: First, that the bankrupt failed to keep just and true books of account from which his true financial condition could be obtained, and concealed his books of account from his trustee, and failed to state them in his schedules; and, second, that in contemplation of bankruptcy he concealed and took to himself assets of the value of $6,000, and made false oath in not including such assets in his schedules. In the consideration of the evidence offered we are met at the outset by the very peculiar circumstances that the books of account kept prior to January 1, 1901, have disappeared, and the trustee has not been able to find them. Their disappearance has been but lamely excused; and at the same time, by an alleged robbery, in which substantially the entire stock in trade of the bankrupt, consisting of a very large quantity of bulky merchandise, is swept away in the course of a spring morning, and has disappeared without a trace being left behind. The conjunction of these two circumstances naturally gives rise to a suspicion of fraudulent dealing which requires explanation. The bankrupt was adjudicated as such in an involuntary proceeding on June 11, 1901. In order to appreciate and understand the full weight of the evidence offered, it is necessary to consider the condition of the bankrupt's affairs and business since the 1st of January, 1901, when, according to his story, he owed nothing, and had on hand a stock of about $800. Between that time and May 10, 1901, he bought largely, having on hand a stock of furs, manufactured, unmanufactured, and in process of manufacture, of the value of about $7,500, and owed at that time, as shown by his schedules, about $7,500, all contracted for merchandise in 1901, or in a space of about four months. He was a manufacturer of furs, and did business at 55 East Ninth street, Manhattan, N. Y. City. The building was formerly a dwelling house, containing three stories and basement. In the basement was a restaurant. On the first floor (a few steps above the sidewalk) a furrier by the name of Harris did business. On the second floor was the bankrupt's place of business, and the third (or top floor) was occupied by the father-in-law of the bankrupt, Henry

Nagorsky, as a residence for his family, which consisted of a wife and two sons. The story of the bankrupt regarding the alleged robbery is that he had made up into garments a large quantity of the furs which he had bought, and for which he still owed, and that they consisted of about 12,000 skins and furs, and were of sufficient bulk to fill six or seven large packing cases, although they were not packed, but were on shelves and in boxes and closets in the place of business. Louis Nagorsky, one of the sons of Henry Nagorsky, and a brother-in-law of the bankrupt, and who lived in the upper floor, directly over the place of business, was in the employ of the bankrupt as his bookkeeper. On the night between the 9th and 10th of May, 1901, and at about 4:30 o'clock in the morning of May 10th, Louis Nagorsky testifies that, having been ill, and having taken a cathartic the night before, he was awake at about 4:30 a. m., and had gone down to a toilet room on the same floor as the place of business, on the floor below that on which he lived, and discovered that the door leading into the place of business had been broken open by removing a panel, and that a robbery had been committed, and everything was upset. He also discovered that the front door on the first floor had been broken open and was standing open. He reported the fact to his father, and sent him to the police station to report the alleged robbery. The witness Louis Nagorsky testifies very positively that the robbery took place between 4 and 5 o'clock in the morning, although he heard no noise, or breaking in the doors, or removing the goods; but when he came downstairs at about 4:30 in the morning the robbery was complete and the robbers and goods had disappeared, leaving no trace. There is little doubt but that the front street door was broken open or opened between 4 and 5 o'clock, as the police officer on the beat, who had a very short post, and paid particular attention to the business portion of it, tried the door at 4, and found it closed, and upon returning from the other portion of his post at 4:45 he at once saw that the door was open, and went into the place, and was told of the robbery. I am therefore convinced that whatever took place in that place of business occurred between 4 and 5 o'clock in the morning of May 10, 1901. I am bound to take notice that at the hour named the day has dawned, and by 4:30 there is fairly good daylight. There was no elevator in the building. If any goods were taken they had to be carried downstairs. If they were taken out in cases, the cases must have been brought through the front door and up a flight of stairs (as no cases were removed), and then carried down again after they were packed. If the goods were carried in bags, or in the arms of the thieves, they must have made many trips to carry 12,000 skins, or made-up garments. They must have had a wagon waiting for them in which to carry them away. The store was in a busy part of the city, in which people are moving about between 4 and 5 in the morning, and yet no one is produced who saw any signs of a robbery, or who saw any one about the premises, or any horse and wagon in the neighborhood. Nor have the diligent detectives who had charge of the case ever found the slightest clue to the robbers or the goods. It must also be taken into careful consideration that the bankrupt had in his employ from five to nine workmen engaged in preparing the skins and making them up into garments, and the bankrupt claims that they were busily engaged in that work; but not one workman is produced who could testify as to what furs or skins were in the place of business before May 10th, nor is there one word of evidence to show that any of the workmen came to work on the morning of May 10th, and found that their services were no longer needed, because of the disappearance of the immense amount of goods. If it has been as the bankrupt claims, some one or more of the workmen could have cleared away all doubt by showing when he left his work on the night of May 9th the goods were there, and when he returned to his work on the 10th they had all disappeared. I regard the omission to produce one of these men as significant and important, and as almost conclusive against the contention of the bankrupt. The only disinterested person who is produced was at the store on the 9th of May, and saw no large amount of goods, and saw no work going on, and was told by Nagorsky that they were not manufacturing any more; but the suspicion to which the statement might give rise was attempted to be cleared away by the bankrupt going to the place of business of this man, and stating that he could manufacture samples for them if they wanted them, and that

Nagorsky was a d——n fool for saying what he had said. Another curious circumstance is that there was an alarm bell connected with the door of the bankrupt's place of business, which rung when the door opened, but the Nagorskys say the wires had been broken or cut some time before the alleged robbery. The appearance of confusion in the place of business when Nagorsky discovered the alleged robbery is suspicious. He says that boxes and furs were strewn about the floor. But there appears no reason why the muffs or other garments in those boxes should not have been taken. There is no evidence that they were not as valuable as the goods which were taken. From the entire evidence, and without regard to the disappearance of the books, and making every allowance for the salutary requirement of the law that, where an act is susceptible of an innocent construction, it should be so adjudged, rather than a guilty or fraudulent one, I am convinced that there was no robbery committed in the premises of the bankrupt on May 10, 1901, or at any other time, and that the goods had been removed by the bankrupt before that date, pursuant to a fraudulent scheme to keep them for his own benefit and to cheat his creditors of their just claims, and that he conceals the property from his trustee, and fraudulently omitted it from his schedules, and made false oath to his schedules in omitting to set it forth as part of his assets.

"But if there could, upon such overwhelming proof of fraud, be left a lingering doubt, it is removed by the disappearance of the books of account prior to January 1, 1901. The bankrupt was bound to aid his trustee and his creditors by every means in his power to discover the true state of his affairs, and to show all his debtors and all his creditors, and particularly so under the peculiar facts in this case. He had a full set of books prior to January, 1901, and kept them in his desk. He says he took the new set of books to his lawyer, but left the old ones, including his checkbook, in the desk, and never saw them again after the receiver was appointed. But why did he not mention them in his schedules? He did not know that they were lost when his schedules were prepared. But who could possibly have an interest in taking the old books but the bankrupt? And for what honest purpose could he have taken them, or caused them to be taken? The receiver did not find them when he took possession, nor any trace of them. The learned counsel for the bankrupt contends that, as he was keeping a full set of books at the time of his failure, which are not shown to be false, he was complying with the bankruptcy law. If those books would show his true financial condition, it would undoubtedly be a compliance with the law; but if they would not, or if there is a strong suspicion that they would not, then they are of no more utility than if they had been opened the week or the day before the failure. If there were proofs that all open accounts in the old books had been transferred to the new ones, they would fulfill all requirements; but such is not the case. The bankrupt had on January 1, 1901, goods outstanding amounting to $2,000. They were not transferred to the new books, and their collection is not fully shown. The new books contain no inventory of stock on hand on January 1, 1901, either by transfer from the old books or otherwise. There were many transactions had by the bankrupt in loaning and borrowing money covering a long period of time regarding which no entries were carried from the old books or entered in the new. It is true that the bookkeeper, McGinley, testified that the true financial condition of the bankrupt could be ascertained from the new set of books, providing that the entries in them were true, and providing that they stated all the facts from the old books; but the evidence shows conclusively to my mind that they did not contain all necessary and proper entries, and were incorrectly kept and untruthful. It is quite time, in my opinion, that bankrupts recognize the fact that when they are asking the benefit of the beneficent provisions of the bankrupt law, and are asking to be discharged from their debts and to be again restored to commercial credit, that they should recognize the necessity of acting with absolutely good faith with the court and their creditors, and in aiding by every means in their power a fair and full discovery of their assets and a fair distribution of them among their creditors, rather than hampering the court and the trustee in every manner which cunning can suggest to cover up and hide the true condition of their affairs, and depriving their creditors of the benefit

of such assets as remain. I am of opinion that the specifications are fully sustained by the evidence, and that the discharge of the bankrupt should be denied. I return herewith all the proceedings had before me and the evidence taken herein. All of which is respectfully submitted.

"Dated May 7th, 1902.      [Signed]  Ernest Hall, Special Commissioner."

With regard to the failure of the bankrupt to produce any of his many alleged employés as witnesses in his behalf before the special commissioner, which failure is commented upon by the commissioner, it should be noted that more than four months have now elapsed since the former hearing, and that the bankrupt has still failed to produce any of the alleged employés in spite of the fact that his position is more critical now than on the former occasion. The disappearance of the salesman who, according to the testimony of the bankrupt, was at the store on the day before the robbery, but has failed to present himself since, is still left wholly unaccounted for and mysterious. No possible motive for the action has been suggested by the bankrupt, and one can only infer that this salesman must have known in advance of what was to happen. It must be further noted that the bankrupt has made contradictory statements in regard to the amount of his loss by the alleged robbery. Monaghan, the patrolman, and Seeleck, the detective, both testify that the bankrupt told them at the time that the value of the goods stolen was $2,660, while the bankrupt himself testified that his loss was $6,500. Apparently the first statements were made in haste, and the amount claimed to have been lost by the alleged robbery was on second thought increased so as to correspond more nearly with the goods which had been purchased within the four months previous, and the disposition of which was not accounted for in the books. Under all the circumstances of the case, I am of the most positive opinion that no robbery of the bankrupt or of his place of business ever took place, and that the whole story of such robbery, as told by the bankrupt and his witnesses, is absolutely false, and part of a barefaced and audacious scheme of the bankrupt to cheat and defraud his creditors. I am also of the opinion that all the property of the bankrupt which he has not credibly and properly accounted for has been fraudulently concealed or disposed of by him, and that he is now chargeable with the same, or with its value. In respect to such value the testimony of the bankrupt himself that the value of the goods stolen from him was $6,500 is a conclusive admission by him that at the time of the alleged robbery he had property of that value, and that no part of such property, or the proceeds thereof, passed to the trustee herein. It follows, therefore, that the bankrupt must now be held to have in his possession or under his control property of the value of $6,500, which he is fraudulently concealing and withholding from his creditors.

The powers and duties of the courts in such a situation are definitely and clearly set forth in the Matter of De Gottardi (D. C.) 114 Fed. 328. At page 332 of this case, as reported, the judge says: "That a bankruptcy court has jurisdiction, on issues properly joined, to determine whether or not a bankrupt has in his possession or under his control money or other property belonging to his estate in bankruptcy, and, if the issues be found against the bankrupt, to make an order requiring him to pay or deliver to the trustee in bankruptcy the money or other property so found to be in his possession or under his control, and to enforce obedience to such an order by commitment as for contempt, are well-settled propositions." The facts of this case are similar to those now presented, the bankrupt having told a story of payments of $6,000 and $425, respectively, and also of a robbery of $7,500, and the referee having refused to believe him, and having made an order that he pay over the property. Upon these points the judge says as follows: "De Gottardi's claim that he gave $6,000 to a woman and $425 to a doctor involves the admission that he did have that amount of money in his possession belonging to the estate of the bankrupts. This fact, however, is also testified to by Righetti, as well as evidenced by the books of the firm. The only question, therefore, to be determined on this branch of the case is whether or not De Gottardi's statement of his disposition of the money is to be believed. It has been said by high authority: 'The bankrupt, when on examination, after admitting the possession of property, must clearly account for the same to the satisfaction of the court, otherwise he must be held to still have it in his

possession and be able to hand it over to his assignee, and, on failing or refusing to account in a reasonable manner for the disposition of assets which have been traced to him, must be held to be acting in contempt of the jurisdiction of the court.' In re Salkey, 21 Fed. Cas. 238 (No. 12,253). Can it be claimed that De Gottardi has accounted in a reasonable manner for the $6,500 which he admits to have been in his possession but a short time before the petition in bankruptcy was filed by asserting that he gave $6,000 to a woman and $425 to a doctor, when he refuses on cross-examination, where there is no immunity from self-criminatory evidence, to name the woman or the doctor to whom he says the money was given? Such a claim would be preposterous. If his testimony in this regard had been true, its corroboration would have been within his power. In the absence of such corroboration, under all the circumstances of this case, the issue cannot be otherwise found than against him. The claim of the bankrupts that they were robbed of $7,500° is likewise an admission of the fact that they did have in their possession that amount of money belonging to their estate. Here, again, the question to be determined is whether or not the testimony of the bankrupts in regard to the alleged robbery is to be accepted as true or rejected as false." See, also, Matter of Taylor, 7 Am. Bankr. Rep. 410, 114 Fed. 607, where the bankrupt's story that he had been robbed of $1,700 was refused credence, and he was accordingly imprisoned for contempt for failure to pay over the money as ordered. The general rule in this connection, as established by a long line of authorities, is that where it is shown that the bankrupt had property shortly before the bankruptcy proceedings, and he fails to account for such property credibly and properly, he must be held to have the same still in his possession or under his control, and must be required to pay it over forthwith, or suffer the consequences.

The prayer of the petition herein must accordingly be granted, and an order made requiring the said bankrupt to turn over forthwith to the trustee property of the value of $6,500 heretofore concealed by him from said trustee, and consisting of furs and skins, or the sum of $6,500 in money.

James, Schell & Elkus, for trustee.
Epstein Bros., for bankrupt.

HOLT, District Judge. I think that Judge Adams, by making the order allowing the bankrupt five days after the entry of the order to comply with the order of Mr. Referee Willis, is to be deemed to have affirmed the order of the referee on the petition for review, and that Judge Adams, by striking out the provision in the order as submitted, "that in default thereof let the above-named bankrupt be committed to jail for contempt of this court," did not thereby adjudicate that the bankrupt should not be punished for contempt, but left such a motion to be brought on at a subsequent period, if the bankrupt did not avail himself of the opportunity to pay within the five days afforded by the order. I think, therefore, that I am precluded from passing upon the question whether there was error in the admission of evidence before the referee, and that the simple question before me is whether the bankrupt has complied with the order of the referee, which was impliedly affirmed by Judge Adams.

The motion is granted. An order will be entered adjudging the bankrupt in contempt, and providing for his being committed to jail until he complies with the order of the referee.